BERNARD CHODOS and GERTRUDE CHODOS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Chodos v. Commissioner
Docket No. 784-76.
United States Tax Court
T.C. Memo 1978-413; 1978 Tax Ct. Memo LEXIS 98; 37 T.C.M. (CCH) 1716; T.C.M. (RIA) 78413; October 16, 1978, Filed Stephen E. Lampf,David J. Pleva and John M. Clyne, Jr. for the petitioners. William M. Gross, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax for the calendar years 1971, 1972 and 1973 in the amounts of $ 16,696.18, $ 15,354.86 and $ 14,571, respectively. Certain issues raised *99 by the pleadings have been conceded by petitioners, leaving for our decision only whether stock of U.S. Home and Development Corporation received by Bernard Chodos was a gift or compensation. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, Bernard and Gertrude Chodos, husband and wife, who resided in Springfield, New Jersey, at the time of the filing of their petition in this case, filed joint Federal income tax returns for the calendar years 1971, 1972 and 1973. During the years 1954 through June 30, 1975, when he retired, Bernard Chodos (petitioner) was employed by U.S. Home and Development Corporation (Home) or its predecessors in various executive capacities. During the years 1954 through 1968, petitioner owned less than 1 percent of the outstanding corporate stock of Home. A major portion of the stock of Home was owned during this entire period by Mr. Robert H. Winnerman. Mr. Winnerman's wife is the sister of petitioner's wife. Prior to July 1968, petitioner did not have a formal employment agreement with Home. Under date of July 1, 1968, petitioner and Home entered into a formal employment agreement providing for *100 petitioner's employment by the company until June 30, 1975. This agreement set forth petitioner's compensation with provisions for death and retirement benefits. It provided for adjustments to these amounts to reflect increases in the cost of living determined by taking into account the Consumer Price Index. Late in 1967 or early in 1968, Mr. Winnerman and Messrs. Charles and Arthur Rutenberg, who were brothers, began discussing the merger of Home with Imperial Land Corporation, a Florida corporation, and its subsidiary and affiliated companies (collectively referred to as Imperial Land). Under the proposed plan, Home was to acquire the stock of Imperial Land and the name of the merged companies was to be Home. Both Home and Imperial Land were engaged in the home construction business. Prior to the merger, Home operated primarily in the New Jersey area and Imperial Land in Florida and surrounding area. Imperial Land had also been engaged in investments in real estate and other fields. At the time merger was being discussed, the majority of the stock of Imperial Land was held by Messrs.Charles and Arthur Rutenberg. As part of the agreement with respect to the merger, a *101 public offering of the stock of Home immediately following the merger was contemplated and the proposed merger was based on the success of the underwriting of the public stock offer. On February 17, 1969, the merger took place with all the outstanding shares of Imperial Land being acquired by Home. On February 18, 1969, a public offering of convertible debentures and stock in Home was effected. After the public offering was completed, Mr. Winnerman was the record and/or beneficial owner of 305,157 shares of Home and Messrs. Charles and Arthur Rutenberg were the record and/or beneficial owners of 850,000 shares. Around the time Mr. Winnerman began negotiations with Messrs. Charles and Arthur Rutenberg he discussed with his wife his desire to give some stock in Home to petitioner. He told his wife that he was considering giving 10,000 of his shares in Home to petitioner. Mr. Winnerman later discussed his desire to give some shares in Home to petitioner with his certified public accountant and his attorney. When Mr. Winnerman had these discussions with his accountant and his lawyer, they pointed out to him that Mr. Herbert M. Hutt and Mr. Philip Frank were loyal employees *102 of Home and might feel very disgruntled were Mr. Winnerman to give stock to petitioner if no stock were transferred to them. The attorney suggested to Mr. Winnerman that instead of his giving a part of his stock to petitioner, the corporation issue 10,000 shares of stock to each Mr. Hutt, Mr. Frank and petitioner. He pointed out that in this way the three company executives would receive the same amount of stock without Mr. Winnerman reducing the number of shares he held. On July 24, 1968, at a meeting of the Board of Directors of Home, the employment contract entered into between Home and petitioner on July 1, 1968, and similar contracts except for amounts of compensation entered into between Home and Mr. Hutt and Home and Mr. Frank were approved by the board of directors. Following this approval, the chairman of the meeting, Mr. Winnerman, stated that it would be appropriate to consider the restricted stock bonus agreements between the corporation and each of Messrs. Chodos, Frank and Hutt, copies of which were before the meeting.After discussion, the board of directors adopted the following resolution with respect to the stock bonus agreement with petitioner: RESOLVED that *103 the Restricted Stock Bonus Agreement providing for the issuance of 10,000 shares of common stock of the Corporation to Mr. B. Chodos, in the form presented to this meeting, be and the same hereby is in all respects authorized and approved, and the President of the Corporation be and he hereby is authorized, empowered and directed to execute and deliver said Agreement, with such changes therein as the signing officer, upon the advice of corporate counsel, shall approve, his execution of such Agreement to be conclusive evidence of such approval, and that pursuant to the aforesaid Restricted Stock Bonus Agreement, the Corporation issue an aggregate of 10,000 shares of common stock to Mr. B. Chodos, and the proper officers of the Corporation be and they hereby are authorized, empowered and directed to take all action and to execute all documents and instruments as may be necessary and proper in order to carry out the terms of such Agreement and this resolution. Similar resolutions were adopted with respect to stock bonuses of 10,000 shares each for Mr. Hutt and Mr. Frank. At a meeting of the Board of Directors of Home on October 14, 1968, the Restricted Stock Bonus Agreements approved *104 at the July 24, 1968, meeting of the board of directors were modified to provide that the recipients of the stock bonuses pay $ 1.50 as consideration for each share to be received. This was the same price that had been required in a restricted stock option plan of Home that had previously expired without any shares being purchased. During the course of preparing the filing for the public offering of shares of Home, the underwriters strongly objected to the stock bonus provision as adopted by Home at its board of directors meetings on July 24, 1968, and October 14, 1968. At that time Home shares were selling for approximately $ 3 and Mr. Winnerman anticipated that after the public offering the shares would be selling from somewhere between $ 20 and $ 25 a share. Since Mr. Winnerman owned over 300,000 shares of Home stock, he was very concerned with the objection to the stock bonuses made by the underwriters. He discussed the objection of the underwriters with petitioner. From this discussion petitioner understood that the underwriters were very much opposed to the bonus shares which might be considered as a "give away" and that the underwriters insisted that the bonus shares *105 agreements be dropped if the underwriting was to proceed. After this discussion, petitioner agreed to the termination of the stock bonus agreement which had been voted by the board of directors on July 24, 1968, and October 14, 1968. Mr. Hutt and Mr. Frank also agreed to the termination of the stock bonus agreement. At a meeting of the board of directors held on February 17, 1969, the chairman, Mr. Winnerman, brought before the board the stock bonus agreement providing for the issuance of 10,000 shares of common stock of Home to each Messrs. Hutt, Frank and Chodos. The chairman stated that: Although it was his belief that the provisions of said Agreement were fair and equitable to the Corporation and that the named individuals were fully deserving of the stock to be issued to them pursuant to said Agreement, he was recommending that said Agreement be terminated and cancelled in order that the securities of the Corporation covered by the Registration Statement referred to above be qualified or registered for sale in various states. * * * After a discussion, the following resolution was adopted by the board of directors: RESOLVED, that the Restricted Stock Bonus Agreement, *106 as modified, providing for the issuance of 10,000 shares of common stock of the Corporation to each of Messrs. H. Hutt, P. Frank and B. Chodos, authorized and approved by the Board of Directors at the Organizational Meeting held on July 24, 1968 and at a Special Meeting held on October 14, 1968, be and the same hereby is terminated and cancelled. Prior to the taking up of the stock bonus agreement at the meeting on February 17, 1969, the board had approved a resolution that the officers of the corporation be authorized and directed to file with the Securities and Exchange Commission a registration statement for the registration of up to 75,000 shares of common stock of the corporation to be offered and sold upon the exercise of options issued under the corporation's 1969 employees stock option plan. The registration statement filed with the Securities and Exchange Commission on February 18, 1969, contained a provision entitled "Qualified Stock Option Plan." This provision recited that on February 17, 1969, the company adopted a qualified stock option plan subject to shareholder approval under which 75,000 shares of common stock were reserved for issuance upon exercise of options *107 designated as qualified stock options under section 422, I.R.C. 1954. [1] The registration statement under this designation contained, as the last paragraph, the following: On February 17, 1969, options having an exercise price of $ 24.50 per share and covering an aggregate of 40,800 shares of Common Stock were granted to 54 Company employees, none of whom are officers or directors. For the purpose of qualifying the Common Stock offered hereby for sale under the securities laws of some states, the Company has agreed it will not grant options to purchase shares when such options would result in there being outstanding options covering a total number of shares in excess of 10% of the then outstanding shares of Common Stock. Shortly before the public offering of the stock of Home, Mr. Charles Rutenberg was approached by Messrs. Hutt and Winnerman with respect to his willingness to convey some of the shares he was to receive in connection with the acquisition of Imperial Land by Home to Messrs. Hutt, Chodos and Frank, employees of *108 Home. He was informed that Mr. Winnerman would give 10,000 shares of his stock for acquisition by these gentlemen. On February 28, 1969, Mr. Winnerman (referred to as "the stockholder") and petitioner (referred to as "the employee") entered into an agreement. This agreement provided in part as follows: 1. U.S. Home & Development Corporation (the "Company") has employed the Employee and the Employee has served in an executive capacity on a continuing basis for many years. During his employment by the Company, the Employee has devoted his best efforts and business time and attention to the affairs of the Company, of which the Stockholder is a principal stockholder. 2. In consideration thereof, the Stockholder shall deliver to the Employee as soon as practicable after the date of this Agreement an aggregate of 6,334 shares of common stock of the Company, 10" par value, subject to the restrictions provided in paragraph 3 which shall be released only as provided in paragraphs 3 and 4. * * * 3. No share received pursuant to paragraph 2 shall be sold, exchanged, assigned, transferred, discounted, pledged or otherwise disposed of without the Stockholder's prior written consent *109 unless the Employee shall first offer such share for sale to the Stockholder at the price of one cent ($ 0.01) per share (subject to any adjustment hereinbelow provided), in which case the Stockholder shall have the option to purchase such share within thirty (30) days. * * * 4. The certificates for the shares of the restricted stock shall contain the following legend: "Transfer or other disposition of the shares of stock of the Company represented by this certificate is restricted by an Agreement dated as of February 28, 1969. Any transfer or other disposition of such shares, except as expressly permitted by said Agreement, shall be void. A copy of such Agreement is on file at the office of the Company." 5. Commencing on June 1, 1971, the share shall be released from the restrictions in paragraph 3 as follows: 334 shares shall be released on June 1, 1971, and thereafter 1,000 shares shall be released on January 2 of each year commencing January 2, 1972 and ending January 2, 1977. 6. Appropriate adjustment of the purchase price under paragraph 3 and the number of shares to be released under paragraph 4 shall be made for any stock dividend, split-up, recapitalization, *110 reorganization, or issuance of additional outstanding shares by the Company. Also on February 28, 1969, Home and petitioner entered into an agreement which provided in part as follows: AGREEMENT dated as of February 28, 1969, between U.S. HOME & DEVELOPMENT CORPORATION, a Delaware corporation (the "Company") and BERNARD CHODOS (the "Employee"). In consideration of the past services and employment of the Employee, the Company hereby makes the following agreements with respect to the 6,334 shares (the "Shares") of Common Stock, 10" par value per share, of the Company which, subject to certain restrictions, the Employee has received from Mr. Robert H. Winnerman, as of the above date: 1. The Company agrees to use its best efforts to include, upon your request, all or any portion of the Shares in any registration statement or other filing under the Securities Act of 1933, as amended (the "Act"), in connection with a public offering by the Company of its securities or the securities of a person other than the Company in order to permit the public offering of the Shares, provided, however, in the event the underwriter involved in such offering refuses to underwrite the Shares, *111 the Employee hereby agrees to delay offering the Shares for the period of time requested by such underwriter, in which case the Company shall use its best efforts to maintain such registration statement effective for a period of thirty (30) days following the end of such period of delay so requested. * * * On April 3, 1969, Mr. Herbert M. Hutt, as an officer of Home, wrote a letter to Home's attorney - the body of which was as follows: As we agreed on the phone today please immediately arrange for the transfer of stock from Messrs. Winnerman and Rutenburg in the following dimensions: 1. Herbert M. Hutt, one certificate for 333 shares and six certificates for 1000 shares each. 2. Philip Frank, one certificate for 333 shares and six certificates for 1000 shares each. 3.Bernard Chodos, one certificate for 334 shares and six certificates for 1000 shares each. The total number of shares is 19,000. George Kraus is to receive the other 1000 shares and he is to make his own arrangements with you on how he wants to handle it. Arnold Hoffman will as soon as possible send you the agreements. Summarily they will state that we cannot sell the stock for a minimum of two years *112 and thereafter 333 shares on the next January 1st and 1000 shares a year thereafter. Please transfer the shares as soon as possible. On or about April 23, 1969, pursuant to agreements dated February 28, 1969, 10,000 shares in Home owned by Mr. Winnerman, 5,000 shares owned by Charles Rutenberg, and 5,000 shares owned by Arthur Rutenberg were surrendered for cancellation and new shares were issued to the following individuals in the amounts stated: Shares
Chodos
6,334
Hutt
6,333
Frank
6,333
Kraus
1,000
Total
20,000
The shares were lettered stock subject to restrictions affecting their resale and subject to the restrictions set forth in the February 28, 1969, agreements. The resale restrictions were changed by an amendment dated February 11, 1971, which provided for release of 3,000 shares from the restrictions set forth in paragraph 3 of the February 28, 1969, agreement on the date of the filing of a registration statement with the Securities and Exchange Commission and thereafter the release of 2,000 shares on January 2, 1972, and 1,334 shares on January 2, 1973. At about the same time petitioner and Messrs. Hutt, Frank and Kraus received shares *113 in Home, key executives in Imperial Land and that corporation's account received shares of Home from Messrs. Charles and Arthur Rutenberg. Mr. Winnerman and petitioner have been close friends for many years and Mr. Winnerman has a deep affection for petitioner. Prior to the merger of Home and Imperial Land in 1969, Home averaged annual sales of approximately $ 5 million and Imperial Land and its subsidiaries averaged annual sales of approximately $ 15 million. Soon after the merger and public offering, Mr. Winnerman became chairman of the board of Home and saw it grow to $ 350 million per year in sales and eploy 5,000 people. After Mr. Winnerman became chairman of the board, his office was not located at the same place as petitioner's office and he had little day-to-day contact with petitioner. In 1973, Mr. Winnerman and his wife took petitioner and his wife on an extended trip to the Orient. The value of the trip was approximately $ 10,000. On June 30, 1975, petitioner retired from employment at Home in accordance with his 1968 employment agreement and has been receiving a pension under that agreement which will continue for the remainder of his life. At the time of *114 the trial of this case the pension received by petitioner under the agreement was approximately $ 20,000 per year. Mr. Winnerman filed no gift tax return with respect to the 10,000 shares of stock he surrendered for cancellation on or about April 23, 1969, and did not claim any income tax deduction with respect to this stock. Sales of the transferred shares of Home were made by petitioner and reported on his Federal income tax returns as follows: No. of
Gross
Cost
Long- Shares
Sales
or
term Sold
Date Sold
Price
Basis
Gain
3,000
3/9/71
$ 124,050
None
$ 124,050
3,000 *
11/20/72
83,283
None
83,283
Sometime in early 1972, the accountant for the corporation, Mr. Kraus, who also prepared petitioners' tax returns, wrote to a firm of lawyers with respect to the 1969 transfer of stock. Under date of April 6, 1972, he received a reply, the first paragraph of which is as follows: You have requested that we render an opinion with respect to the income taxation of stock subject to certain restrictions that was acquired by a client of yours in a compensatory transaction predating the effective date of the 1969 Tax *115 Reform Act. Based upon the facts and legal analysis hereinafter set forth, it is our opinion that your client should not incur any income tax liabilities with respect to the transaction until said stock is sold by your client. Upon the sale of said stock, your client should incur a capital gains tax on the difference between his basis in the stock and the net proceeds realized from the sale. Respondent in his notice of deficiency determined that petitioner had failed to report income in 1971, 1972 and 1973 at the time of the lapse of restrictions or sale of the 6,334 shares of stock he had received and recomputed petitioner's income tax accordingly, increasing reported income by $ 31,500, $ 26,250 and $ 28,014 for the years 1971, 1972 and 1973, respectively. Respondent explained the adjustments as follows: It has been determined that you failed to report ordinary income in the years 1971 and 1972 at the time restriction lapsed or the stock of U.S. Home and Development Corporation was sold. These are the same shares of stock which you received on/or about 2/28/69. Income for 1971 and 1972 has been computed on the basis of the fair market value of unrestricted shares on 2/28/69 since *116 this value is less than the fair market value on 3/9/71 or 1/2/72; and/or the selling price of the shares sold in 1971 and 1972. Computations have been made for a two for one stock split that occurred on 7/30/71. Capital gains reported on returns for 1971 and 1972 have been adjusted consistent with the above determination. * * *
It has been determined that you failed to report ordinary income of $ 28,014.00 representing the fair market value @ 2/28/69 of 2,668 shares of U.S. Home and Development Corp. stock which you received as of that date and whose restrictions lapsed on 1/2/73.Unrestricted shares of stock were selling on 1/2/73 @ an average of $ 22-1/2 per share and on 2/28/69 @ $ 21.00 per share. Initially petitioner contested respondent's method of computation, but has now conceded that the computation is not in error if the Court determines that the 6,334 shares of Home stock he received in 1969 were not a gift. OPINION Both parties recognize that unless the stock transferred to petitioner was a gift within the meaning of section 102(a), respondent's determination as to the amount includable in petitioner's gross income is correct. Whether property transferred *117 by one individual to another is a gift has been the subject of much litigation through the years. It has long been recognized that the term "gift" as used in the statute is not to be equated with a gift in the common law sense. While the existence of a legal or moral obligation to make a transfer of property is strong evidence that the transfer is not a gift, it has long been settled that the absence of such a legal or moral obligation does not establish that the transfer is a gift. Old Colony Trust Co. v. Commissioner,279 U.S. 716 (1929). The Supreme Court, in Commissioner v. Duberstein,363 U.S. 278, 280, 285-286 (1960), after reciting the basic principles set forth above, stated the following criteria for determining whether in fact a transfer is a gift for Federal income tax purposes: And, importantly, if the payment proceeds primarily from "the constraining force of any moral or legal duty," or from "the incentive of anticipated benefit" of an economic nature, Bogardus v. Commissioner, 302 U.S. 34, 41, 58 S.Ct. 61, 65, 82 L.Ed. 32, it is not a gift. And, conversely, "[where] the payment is in return for services rendered, it *118 is irrelevant that the donor derives no economic benefit from it." Robertson v. United States, 343 U.S. 711, 714, 72 S. Ct. 994, 996, 96 L.Ed. 1237. [Footnote omitted.] A gift in the statutory sense, on the other hand, proceeds from a "detached and disinterested generosity," Commissioner of Internal Revenue v. LoBue, 351 U.S. 243, 246, 76 S. Ct. 800, 803, 100 L.Ed. 1142; "out of affection, respect, admiration, charity or like impulses." Robertson v. United States, supra, 343 U.S. at page 714, 72 S. Ct. at page 996. And in this regard, the most critical consideration, as the Court was agreed in the leading case here, is the transferor's "intention." Bogardus v. Commissioner, 302 U.S. 34, 43, 58 S. Ct. 61, 65, 82 L.Ed. 32. "What controls is the intention with which payment, however, voluntary, has been made." Id., 302 U.S. at page 45, 58 S. Ct. at page 66 (dissenting opinion). [Footnote omitted.] Also, as recognized in the Duberstein case (at 289), the intention of the donor is primarily a determination of fact which must be made from the "totality of the facts of each case." The donor's characterization of his *119 action is not determinative, but there must be "an objective inquiry as to whether what is called a gift amounts to it in reality." Commissioner v. Duberstein,supra at 286. Considering the principles set forth in the case law as applied to the facts in this case, we conclude that the transfer of the 6,334 shares of Home stock to petitioner was not a gift within the meaning of section 102(a). Sometime early in 1968 Mr. Winnerman considered transferring 10,000 shares of his Home stock to petitioner. He discussed this consideration with his wife in terms of his making a "gift" of the 10,000 shares to petitioner. Later he discussed the transfer of the 10,000 shares to petitioner with his accountant and lawyer in terms of making a "gift" of the shares to petitioner. Petitioner was not informed of these discussions. Mr. Winnerman did not transfer the 10,000 shares to petitioner following these discussions. On the advice of his lawyer, Mr. Winnerman decided to have 10,000 shares of stock issued as a bonus by the corporation to each petitioner, Mr. Hutt and Mr. Frank. Had 10,000 shares of stock actually been transferred by the corporation to each of these executives *120 as a bonus, clearly the transfer would have been compensation to the executives. The resolutions to make the transfers were couched in language of compensation. Nothing in the record indicates that the stock bonuses were ever considered as other than compensation. However, because of its possible detrimental effect on the underwriting of a stock issue, which underwriting was an essential element in the merger of Imperial Land into Home, the proposed stock bonus was not paid to any of the three executives and all three of them, including petitioner, agreed to the termination of the stock bonus agreement. The agreement was terminated by the board of directors of Home on February 17, 1969. The record is clear that the merger of Imperial Land into Home was of great importance to Mr. Winnerman. It not only carried out his plan to establish a national company but immediately increased his wealth by several million dollars. Although there is no direct testimony in the record as to whether petitioner, Mr. Hutt and Mr. Frank were made any promises with respect to receipt of other stock when they agreed to the termination of the stock bonus agreement, petitioners argue that there is *121 an inference in the record that they were not. While we do not accept petitioners' argument in this respect, our conclusion in this case is not based on whether any such direct promise was made to petitioner and Messrs. Hutt and Frank. In our view, the record is clear that the intent of Mr. Winnerman and Messrs. Charles and Arthur Rutenberg in forming a pool of 20,000 shares of stock to be transferred to petitioner, Mr. Hutt, Mr. Frank and the accountant of Home, Mr. Kraus, was to compensate them for their contributions to the company, including their having agreed to the termination of the stock bonus agreement. A letter written by Mr. Charles Rutenberg, which was stipulated into the record, in effect states that this was his understanding. While Mr. Winnerman never specifically testified that he had a similar understanding, he did testify with respect to the pressures he brought on Messrs. Charles and Arthur Rutenberg to put up 5,000 shares each so that stock could be transferred to petitioner and to Messrs. Hutt and Frank. Mr. Winnerman did not claim to have any intention of making a gift to Mr. Hutt and Mr. Frank, but rather stated that they were outstanding employees and *122 he did not want them to be disgruntled employees. In this context, it appears clear to us that the transfer of the stock to all three of the Home executives, including petitioner, was in recognition of their contributions to Home and their cooperation in agreeing to the termination of their stock bonus agreements. A transfer of property with an intent to compensate a person for such actions does not constitute a gift within the meaning of section 102(a). Petitioners contend that the qualified stock option plan adopted by Home at the meeting of the board on February 17, 1969, was a substitute for the termination of the stock bonus agreement. A mere reading of the provisions of the qualified stock option plan shows that it was in no way a substitute for the terminated stock bonus agreement. Petitioner testified that he was not aware of any intention on the part of Mr. Winnerman to transfer stock to him until the meeting of the board of directors on July 24, 1968, when the resolution providing for the stock bonus agreement under which 10,000 shares of Home stock was to be transferred to him was passed. Petitioner was present at this meeting. He testified that he was quite surprised *123 when the resolution was adopted since he felt he had been fully compensated through the years for the work he had done for Home. If Mr. Winnerman had considered making a "gift" of stock to petitioner, he had never communicated this fact to petitioner. The circumstances surrounding the transfer of the 6,334 shares of Home stock to petitioner had none of the indicia of a gift.The agreement between petitioner and Mr. Winnerman with respect to selling the stock back to Mr. Winnerman and the restrictions to be placed on the stock are indicative of stock issued other than as a gift. Neither Mr. Winnerman nor petitioner in his testimony at the trial explained to the satisfaction of the Court why this agreement would be entered into if a gift of the stock were intended. All the other writings surrounding the transfer of the stock negate any intention on Mr. Winnerman's part to transfer the stock to petitioner out of "detached and disinterested generosity." The indication from all the writings is that the transaction was of a business nature. We do not question the affection that existed between Mr. Winnerman and petitioner or that Mr. Winnerman may on some occasion have made a gift to *124 petitioner. However, the stock transferred in the transaction here involved was transferred as a part of an overall plan to compensate the executives of Home who had contributed to the growth of its business and cooperated in the underwriting of a public stock issue following its merger with Imperial Land. Petitioners and respondent disagree as to whether the 6,334 Home shares were transferred to petitioner from Mr. Winnerman or from a pool of 20,000 shares of Home stock formed by transfers of stock by Mr. Winnerman and Messrs. Charles and Arthur Rutenberg. In our view it is immaterial whether the 6,334 shares were transferred directly to petitioner from Mr. Winnerman or were transferred to petitioner from a pool of shares.The transfer by Mr. Winnerman was not with the intent to make a gift to petitioner within the meaning of the term "gift" as used in section 102. It is this fact that is controlling. None of the cases relied on by petitioners in which courts have held transfers of property to be gifts are factually comparable to this case. Therefore, no useful purpose would be served in discussing these cases. On the basis of this record as a whole, we conclude that the *125 transfer to petitioner in April 1969 of 6,334 shares of Home stock was not a gift within the meaning of section 102(a). Decision will be entered for the respondent. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
*. Split shares.↩